## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 11-CV-02937-RM

**UNITED STATES OF AMERICA,**
**ex rel. BONNIE M. JIMENEZ,**
Plaintiff,

v.

**OTTER PRODUCTS, LLC d/b/a OTTERBOX, a Colorado corporation**
Defendant.

---

## AMENDED *QUI TAM* COMPLAINT AND JURY DEMAND

---

The Relator, Bonnie M. Jimenez, by and through her counsel of record, acting as Relator

on behalf of the Government of the United States of America (the "Relator"), states the

following Amended Complaint against the Defendant Otter Products, LLC d/b/a OtterBox

("OtterBox"):

## I.    INTRODUCTION

1.        This lawsuit is brought pursuant to the provisions of the False Claim Act

["FCA"], 31 U.S.C. § 3729, *et. seq.*, to recover monies which OtterBox knowingly underpaid to

the United States. The Relator challenges the material records, statements, payments and other

materials which OtterBox "knowingly" submitted, or caused to be submitted with respect to

OtterBox's U.S. customs import duties or fees, in violation of 31 U.S.C. § 3729(a)(7) as

amended October 27, 1986 and 31 U.S.C. § 3729(a)(1)(G) as amended May 20, 2009.

2.        This *qui tam* suit concerns OtterBox's failure to increase the transaction value of

the products that it imported to properly account for the value of foreign, third party engineering,

design and product development services and OtterBox's failure to account for the expenses associated with the foreign based design, engineering, preparation and manufacture of the molds or dies employed by the product's manufacturer.

3.      The principal events at issue transpired in the time period from at least January of 2006 through at least approximately February of 2011.  On information and belief, certain aspects of OtterBox's submissions of knowingly false reverse claims may be continuing to the present.

4.      Relator Bonnie M. Jimenez ("Jimenez") is a resident of Brighton, Colorado.

5.      Ms. Jimenez was hired by OtterBox in August of 2009 to work as its logistics coordinator.

6.      In approximately November of 2009, Ms. Jimenez was promoted to work as OtterBox's supply chain director and remained in that capacity until August of 2010 when she was terminated by OtterBox.

7.      At all times material hereto, Ms. Jimenez held a U.S. Import Broker's license and had significant expertise in determining the import values which should have been reported and the correct amount of import duties which OtterBox should have paid to the United States.

8.      In her capacity as OtterBox's supply chain director, Ms. Jimenez was responsible for and/or involved in all aspects of a given product's conception to its ultimate delivery to OtterBox; basically everything upstream of the product's receipt including the warehouse management, product development and manufacture, product importation, customs practices and compliance, global distribution and product availability.

9.      In particular, Ms. Jimenez has direct and independent knowledge regarding the matters set forth herein, including OtterBox's contractual and working relationships with foreign engineering companies and manufacturers, product importation and its customs practices and compliance.

10.     In her capacity as logistics coordinator and supply chain director, Ms. Jimenez was perhaps the OtterBox employee most knowledgeable about OtterBox's customs practices and compliance.

11.     OtterBox is a privately owned Colorado corporation that maintains its principal place of business at 209 S. Meldrum Street, Fort Collins, CO 80521.

12.     OtterBox causes to be manufactured and then sells protective cases for electronic devices such as cells phones, I-Pads, computers and tablets.

13.     In recent years, OtterBox's gross revenue from the sale of these protective cases has increased significantly.  The following chart summarizes the publicly available information regarding OtterBox's gross revenue:

| Year | Revenue |
|------|---------|
| 2006 | $5.7 Million |
| 2007 | $5.1 Million |
| 2008 | $10.2 Million |
| 2009 | $48.6 Million |
| 2010 | $168.9 Million |

14.     At all times material hereto, most of OtterBox's products have been manufactured outside the United States, with most of the manufacturing occurring in the Peoples' Republic of China (P.R.C.).

15.     At all times material hereto, OtterBox has caused to be manufactured and then sold many different products to provide a large range of protective cases for the many different cells phones, I-Pads, computers and tablets that have existed in the marketplace over the years.

16.     In some cases, such as with the I-Phone, OtterBox sells many different products for a single cell phone, I-Pad, computer or tablet.

17.     Each distinct product which OtterBox caused to be manufactured and then sold has been produced under a substantially similar process.

18.     The production process begins with OtterBox deciding to make a new case or product.  The new project is then assigned and OtterBox's domestically based engineers design the product.

19.     The OtterBox engineers develop a product blueprint or CAD which is then sent to China to an independent engineering company ("IEC"), which for a considerable period of time was a company known as Intersource Enterprises Co., Ltd. ("Intersource").

20.     In recent times, OtterBox has employed the services of other independent engineering companies besides Intersource.

21.      The IEC then sends the product blueprint or CAD that was produced by OtterBox's engineers to a potential manufacturer who then reviews the product's specifications and estimates a tooling cost and product cost.

22.     The IEC then notifies OtterBox of the potential manufacturer's tooling and product cost, and if acceptable, OtterBox cuts a purchase order ("PO") to the manufacturer for the design and manufacture of the tooling.

23.     Once the tooling PO has been cut, the manufacturer creates a CAD for the tooling.

24.     An IEC engineer reviews the manufacturer's tooling CAD to validate and redline it against the OtterBox product CAD.

25.     Once the tooling CAD is modified and agreed upon between the manufacturer and the IEC engineer, the tooling production starts.  It typically takes 18 to 32 days to complete the manufacture of the tooling or molds.

26.     Once the tooling is done, the first shots of production are completed.  The IEC then performs a FAIR (first article inspection report) of the first product shots.  If the first product shots do not pass, the tooling may be modified and first shots done again.

27.     Once first shots are inspected and pass the IEC's inspection, 100 units are produced and sent to OtterBox in the USA to conduct its own FAIR P or product inspection.

28.     Once the product passes OtterBox's FAIR P, OtterBox cuts a separate PO to the manufacturer for the production and a FAIR A (FAIR assembly) is completed by the IEC.

29.     Once the FAIR A is completed the full production runs start.

30.     The IEC transmits an invoice to OtterBox for its work for every completed project and OtterBox directly pays the IEC, typically through a wire transfer.

31.     In this process of making a particular product, three POs or invoices are transmitted from or to OtterBox: (1) an invoice from the IEC to OtterBox for the IEC's engineering based work; (2) a PO from OtterBox to the manufacturer for the manufacturer's engineering and manufacturer of the tool or mold; and (3) a PO from OtterBox to the manufacturer for the manufacturer's production of the product units.

32.     OtterBox directly pays the manufacturer the amounts specified in each of the two POs that OtterBox generates and transmits during this process.

33.     Pursuant to the applicable customs statutes, regulations and interpretative case law, all three of the expenses identified in the invoices or POs mentioned in paragraph 31 should have been counted or valued by OtterBox in determining the duty value of a given imported product.

34.     However, OtterBox has employed a scheme, from at least January of 2006 and continuing to approximately February of 2011, whereby the manufacturer creates the customs commercial invoice product transaction value based solely on the last PO or expense, the cost of manufacturing the units of the product, and OtterBox's customs duties have been paid solely on this value.

35.     In addition, OtterBox has employed a scheme, from at least January of 2006 and continuing to at least February of 2011, and perhaps continuing to the present, whereby OtterBox has failed to increase the transaction value, or duty value, by the amounts OtterBox paid the IEC for the engineering, development, artwork , design work, and plans and sketches that are undertaken elsewhere in the United States and are necessary for the production of the imported merchandise.

36.     To be absolutely clear, OtterBox has knowingly failed to specify on the customs entry documents the expenses associated with the IEC's work and the manufacturer's cost of designing and manufacturing the product molds and OtterBox has also failed to increase the transaction value, or duty value, by the amounts OtterBox paid the IEC and paid the manufacturer to design and manufacturer the tools or molds used to produce the imported product.

## II.    JURISDICTION AND VENUE

37.    This action is brought on behalf of the United States Government under 31 U.S.C.

§ 3729, *et seq*., commonly known as the False Claims Act ("FCA").  The Relator brings this

action under 31 U.S.C. § 3730(b) to recover for "false claims" which OtterBox knowingly

presented or caused to be presented to the Government and/or concealed or caused to be

concealed from the Government in violation of 31 U.S.C. § 3729(a)(7) as amended October 27,

1986 and 31 U.S.C. § 3729(a)(1)(G) as amended May 20, 2009.

38.    This Court has jurisdiction over such FCA claims pursuant to 28 U.S.C. § 1331

and 31 U.S.C. § 3730(b).

39.    *In personem* jurisdiction is appropriate in this District because the FCA provides

for nationwide service of process. 31 U.S.C. § 3732(a).  In such circumstances, the relevant

inquiry is whether a given defendant has sufficient contacts with the United States as a whole.

*Appl. To Enforce Admin. Subp. of  S.E.C. v. Knowles*, 87 F.3d 413, 417-419 (10th Cir. 1996).

OtterBox has a significant commercial presence in Colorado and has abundant national contacts.

40.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because OtterBox

can be found or transacts business in this District and/or because one or more of the acts

proscribed by the False Claims Act occurred within this District.

## III.   THE FEDERAL STATUTES, REGULATIONS AND CASE LAW

41.    All customs invoices for the entry of products to the United States must include a

description of "[a]ll goods or services furnished for the production of the merchandise (e.g.,

assists such as dies, molds, tools, engineering work) not included in the invoice price.  19 C.F.R.

§ 141.86 (a)(11).

42.     At all times material hereto, OtterBox owed a duty to exercise reasonable care to classify and determine the value of the imported merchandise and to provide any other information necessary to enable U.S. Customs and Border Protection ("CBP") to properly assess duties, collect accurate statistics and determine whether other applicable legal requirements have been met.  19 U.S.C. § 1484.

43.     The imported goods should be valued on the basis of their "transaction value." 19 U.S.C. 1401a(a)(1)(A); 19 C.F.R. § 152.101(b)(1).

44.     The transaction value is the "price actually paid or payable" plus amounts equal to the value of any "assists."  19 U.S.C. § 1401a(b).

45.     The term "price actually paid or payable" means the total payment (whether direct or indirect) made, or to be made, for imported merchandise by the buyer to, or for the benefit of, the seller. 19 U.S.C. § 1401a(b)(4)(A); 19 C.F.R. § 152.102(f).

46.     With respect to OtterBox's payments to a given manufacturer for the engineering and manufacturer of the tools, dies and molds used to produce a given product, these payments or expenses have been uniformly held to be direct or indirect payments and considered to be part of the price actually paid or payable.  *Ford Motor Company v. United States*, 29 Cust.Ct. 553, 1952 WL 7086 (1952); *Troy Textiles, Inc. v. United States,* 64 Cust.Ct. 654, 1970 WL 14672 (1970); *Chrysler Corp. v. United States*, 17 Ct. Int'l. Trade 1049, 1993 WL 388922 (1993).

47.     An "assist" includes "engineering, development, artwork , design work, and plans and sketches that are undertaken elsewhere in the United States and are necessary for the production of the imported merchandise" and that are supplied by OtterBox directly or indirectly to the manufacturer free of charge or at a reduced cost.  19 U.S.C. § 1401a(h)(1)(A); 19 C.F.R. §

152.102(a)(1)(iv); *Texas Apparel Co. v. United States*, 12 Ct. Int'l. Trade 1002, 698 F.Supp. 932 (1988).

48.     The type of engineering and development work which a given IEC has provided for a given product's manufacturer, at OtterBox's request and expense, is a classic "assist."

49.     Accordingly, the applicable statutes, regulations and interpretative case law required OtterBox to detail on its customs entry documents the engineering work performed by a given IEC and the tooling work performed by the manufacturer, identify the value of this work, and include this additional value in the computation of the product's transaction or duty value.

50.     These required increases in the imported product's transaction value are limited to the requirement that there must be sufficient information:  "Additions to the price actually paid or payable will be made only if there is sufficient information to establish the accuracy of the additions and the extent to which they are not included in the price."  19 C.F.R. 152.103(c); 19 U.S.C. § 1401a(b).

51.     Sufficient information exists to establish the accuracy of these required increases in value as OtterBox generates and/or receives three separate POs or invoices with respect to the expenses at issue: (1) an invoice from the IEC to OtterBox for the IEC's work; (2) a PO from OtterBox to the manufacturer for the manufacturer's engineering and manufacturer of the tool or mold;  and (3) a PO from OtterBox to the manufacturer for the manufacturer's actual production of the product units, and OtterBox makes ledger entries with respect to its payment of these invoices or POs.

52.     These documents should be readily available from OtterBox's commercial record system.

53.     Furthermore, pursuant to 19 C.F.R. §163.4 OtterBox is required to have maintained these records for at least five (5) years from the date of a given product's import.

54.     In addition, at all times material hereto, OtterBox had an affirmative duty to amend any custom duties records or statements which OtterBox then knew, or later realized were inaccurate. See, 19 U.S.C. § 162.71, 162.73 and 162.74.

55.     With respect to OtterBox's underpayments, OtterBox is subject to an obligation to pay interest on these underpayments. *United States v. Texas,* 507 U.S. 529, 533-35 (1993).

## IV.    FACTUAL ALLEGATIONS

56.     At all times material hereto, OtterBox's imported products were subject to a previous classification that had established an import classification code of 4202.99.900, HTSUS, which sets an import duty rate of 20% ad valorem.

57.     From at least January 2006 to the present OtterBox has maintained a business and contractual relationship with foreign independent engineering companies ("IEC"), like Intersource, who have provided engineering, development and design related work outside the United States that was necessary for the production of the imported merchandise.

58.     For example, OtterBox has indentified 31 separate steps or actions that are necessary to the production of a given product, from announcing the new project to receiving the production shipment.  Within these 31 separate steps, the IEC is accountable for 12 of the 31 actions, including obtaining quotes for the design and packaging of the product, developing the tool layouts, receiving the case prototype for package fitting and design, transmitting packaging samples, inspecting and providing to OtterBox initial and subsequent product samples, modifying tools as necessary, inspecting the manufacturer's facilities, functioning as the

engineering and production liaison between OtterBox and the manufacturer, translating and distributing assembly documentation to the manufacturer, performing quality assembly and approval inspection at the manufacturer and monitoring tooling or production delays.

59.     At the conclusion of the production of a given product, the IEC has invoiced OtterBox for its services related to that product and OtterBox has paid the IEC.

60.     Similarly, from January 2006 to the present, OtterBox has maintained a business and contractual relationship with foreign manufacturers who have designed and manufactured the tools or dies necessary to produce a given OtterBox product and who have subsequently manufactured the product.

61.     For example, as of September 12, 2009, OtterBox employed the services of sixteen different Chinese manufacturers, identified as follows:

  a.  AAA Mould Limited;
  b.  Hua Yang Mould Factory Limited/ShenYang Mould Co. Ltd.;
  c.  Yanhen Plastic Production Factory;
  d.  Pego Mould Co. Pego Technology Co. Ltd.;
  e.  Luen Hop Plastic Mould Factory;
  f.  Xin Yoa Yuan Silicone Rubber Technology (Shenzhen) Co. Ltd. (XYY);
  g.  Shanghai Bcolor Inc.;
  h.  Jin Lian Feng Industrial Co. Ltd./Garden Tree Silicone Products (Shenzhen) Co.;
  i.  Ch Fal Electronics Company;
  j.  Hung Cheong Rubber Industrial Company;
  k.  Chi Shing (Dong Guan) Industrial Company Limited;
  l.  Calqiao Epididymibs Abomasus Co. Ltd.;
  m.  Shen Zhen Jiangnar Technology Co.;
  n.  Fancy Manufacturer;
  o.  WINCO Industry, Ltd.; and
  p.  Shanghai Jason Plastics

62.     With respect to each foreign manufacturer, OtterBox employed two Master Supplier Agreements; one was signed for the design and manufacture of the tools or molds for a

given project and then another Master Supplier Agreement was signed for the manufacture of the product units.

63.     Paragraph 2.4 of OtterBox's Master Supplier Agreement stated that OtterBox might have a manufacturer make certain tools or molds to manufacture the product and that these tools and molds were owned by OtterBox.

64.     Paragraph 3.1 of the Master Supplier Agreement specified that OtterBox would issue a purchase order for the production of a given product which would specify the purchase order number, the quantity of product ordered, the product price, the method of shipment, the place of delivery and the delivery date.  This paragraph continued and specified that: **All export documentation is to be created using the identical information as the OtterBox Purchase Order inclusive of HTS codes, unit costs, and unit quantity**." (emphasis supplied).

65.     And, in fact, that was the scheme which OtterBox employed.  For example, on April 9, 2010 OtterBox issued a PO to Jin Lian Feng Industrial Co. Ltd. for the production of 3000 units of OtterBox's Scapolite Gray/Black Clamshell protective case for the Blackberry 8500.

66.     This April 9, 2010 PO identified a purchase price of $2.13 per unit for a total amount of $6,390.00.

67.     When these products were imported to the United States, OtterBox only paid duty on the amount of $6,390.00 and did not increase the products' transaction value by the value of the engineering, development and design services provided by the IEC, Intersource, and similarly did not increase the transaction value by the cost of Jin Lian Feng Industrial Co. Ltd.'s design and production of the tools necessary to produce these 3000 units.

68.     This April 9, 2010 incident is provided as an example of OtterBox's customs underpayment scheme, which was consistently employed by OtterBox from at least 2006. Additional examples of OtterBox's customs underpayment scheme will be demonstrated through discovery and at trial.

69.     Prior to Ms. Jimenez's employment, typically OtterBox would import its products through United Parcel Service ("UPS") or UPS' affiliates.

70.     Shortly after Ms. Jimenez was employed by OtterBox, she switched the import carrier from UPS to FedEx.

71.     At all times material hereto, the sequence of events for importing a shipment of OtterBox products from a foreign manufacturer was: (1) OtterBox provided the foreign manufacturer with a PO; (2) the goods were manufactured; (3) per OtterBox's agreement with the manufacturer, the manufacturer used OtterBox's account with a given carrier, such as UPS or FedEx, to ship the goods; (4)  per OtterBox's agreement with the manufacturer, the manufacturer provided the carrier with only the PO value for the manufacture of the goods, as opposed to including the value of the engineering work or the cost of the dies or molds, to value the shipment; (5) the carrier shipped the goods and brought them into the United States; (6) the carrier provided CBP with only the PO value for the manufacture of the goods to value the goods for customs duties; (7) the carrier paid the customs duties for the goods based only on the value represented by the PO value for the manufacture of the goods; (8) OtterBox was invoiced by the carrier for the expense of shipment and the customs duties which invoicing made available to OtterBox sufficient detail for OtterBox to know the value upon which customs duties were paid; and (9) OtterBox reimbursed the carrier for the customs duties.

72.     A modification to this sequence occurred in approximately September of 2009 at which time OtterBox opened an Automated Commercial Environment ("ACE") account with CBP through which the customs duty payments were made directly by OtterBox, versus the carrier making the customs duty payment.  .

73.     Whether the carrier was UPS, FedEx or one of their affiliates, the carrier would base its import documentation, customs value and the customs duty payment on the information provided by OtterBox or the manufacturer, which in turn was based on OtterBox's production PO value and OtterBox's agreement with the manufacturer.

74.     Therefore, to the extent UPS, FedEx, one of their affiliates, or any other carrier submitted false import documentation or underpaid OtterBox's customs import duties, OtterBox caused or was responsible for the carrier's submission of false statements and/or customs duty underpayments.

75.     For example, on May 22, 2009, UPS shipped into the United States 5,926 units of a given molded plastic case.  The transaction value for these units was solely based on the manufacturer's, AAA Mould Ltd.'s, charge for the production, which in this case was $17,739.70.  The subject customs documentation failed to gross up the customs value to account for the engineering, development and design services provided by Intersource and similarly did not account for the cost of AAA Mould Ltd.'s design and production of the tools necessary to produce these 3000 units.  The customs documentation also did not specify, as required by 19 C.F.R. § 141.86 (a)(11), this additional work.

76.     The number and value of the tools which OtterBox had its Chinese manufacturers make for it were substantial and material to the customs duties which OtterBox should have paid.

For example, the following chart summarizes the massive number of tool purchase orders by manufacturer and identifies the date of each outstanding tool PO as of June 23, 2010:

| Manufacturer | Tool PO # | Tool PO Date |
|---|---|---|
| Luenhop | 3952 | 4/2/10 |
| Luenhop | 3952 | 5/26/10 |
| Luenhop | 3952 | 5/26/10 |
| Luenhop | 3952 | 5/26/10 |
| ChinFai (Turnkey) | 3945 | 4/2/10 |
| ChinFai (Turnkey) | 3945 | 4/7/10 |
| ChinFai (Turnkey) | 3945 | 5/26/10 |
| Pego | 3928 | 4/6/10 |
| Pego | 3928 | 4/6/10 |
| ChinFai (Turnkey) | 3930 | 4/2/10 |
| ChinFai (Turnkey) | 3930 | 4/2/10 |
| ChinFai (Turnkey) | 3930 | 4/2/10 |
| SY(13 entries) | N/A | 5/16/10 |
| JLF(12 entries) | N/A | 5/16/10 |
| Pego | 3966 | 4/9/10 |
| Pego | 3966 | 4/19/10 |
| Bcolor (Turnkey) | 3977 | 4/9/10 |
| Bcolor (Turnkey) | 3977 | 4/19/10 |
| XYY (Turnkey) | 3958 | 4/9/10 |
| XYY (Turnkey) | 3958 | 4/13/10 |
| XYY (Turnkey) | 3958 | 4/9/10 |
| XYY (Turnkey) | 3958 | 4/13/10 |
| XYY (Turnkey) | 3958 | 4/9/10 |
| XYY (Turnkey) | 3958 | 4/13/10 |
| XYY (Turnkey)(3 entries) | 3958 | 4/9/10 |
| XYY (Turnkey) | 3958 | 5/10/10 |
| XYY (Turnkey) | 4294 | 5/25/10 |
| XYY (Turnkey) | 3985 | 4/9/10 |
| XYY (Turnkey) | 3985 | 6/8/10 |
| ChinFai (Turnkey) | 4007 | 4/15/10 |
| ChinFai (Turnkey) | 4007 | 6/21/10 |
| Yahen | 4021 | 4/15/10 |
| Yahen | 4021 | 4/21/10 |
| Yahen | 4021 | 6/14/10 |
| Bcolor (Turnkey) | 4008 | 4/15/10 |

| Manufacturer | Tool PO # | Tool PO Date |
|---|---|---|
| Bcolor (Turnkey) | 4008 | 5/26/10 |
| Bcolor (Turnkey) | 4008 | 6/4/10 |
| Yahen | 4020 | 4/15/10 |
| XYY (Turnkey) | 4179 | 5/11/10 |
| Pego | 4180 | 5/11/10 |
| ChinFai (Turnkey) | 4188 | 5/11/10 |
| Yahen | 4187 | 5/11/10 |
| ChinFai (Turnkey) | 4236 | 5/19/10 |
| ChinFai (Turnkey) | 4236 | 5/26/10 |
| Luenhop | 4267 | 5/19/10 |
| Luenhop | 4267 | 5/26/10 |
| ChinFai (Turnkey) | 4260 | 5/22/10 |
| Yahen | 4259 | 5/22/10 |
| Yuanmong | 4347 | 6/4/10 |
| Golden Bright (Turnkey) | N/A | 6/4/10 |
| SY (Turnkey) | - | 6/10/10 |
| Ka Shui (Turnkey) | N/A | 6/4/10 |
| Ka Shui (Turnkey) | N/A | 6/17/10 |
| ChinFai | 4433 | 6/17/10 |
| ChinFai | 4433 | 6/17/10 |
| ChinFai | 4441 | 6/18/10 |
| Chin Fai | 4441 | 6/18/10 |
| Yahen (Turnkey) | 4430 | 6/17/10 |
| Yahen (Turnkey) | 4430 | 6/17/10 |
| ChinFai (Turnkey) | 4419 | 6/17/10 |
| Yahen | 4448 | 6/17/10 |
| SY (Turnkey) | 3683 | 2/22/10 |
| SY (Turnkey) | 3683 | 2/26/10 |
| SY (Turnkey) | 3683 | 5/27/10 |
| SY (Turnkey) | 3683 | 2/22/10 |
| SY (Turnkey) | 3683 | 2/26/10 |
| SY (Turnkey) | 3683 | 5/27/10 |
| Chin Fai | 3724 | 2/22/10 |
| Chin Fai | 3724 | 5/27/10 |
| Yahen (Turnkey)(2 entries) | 3751 | 2/25/10 |

15

| Manufacturer | Tool PO # | Tool PO Date |
|---|---|---|
| Yahen (Turnkey)(3 entries) | 3751 | 4/23/10 |
| Yahen (Turnkey) | 3751 | 5/26/10 |
| SY (Turnkey) | 3221 | 10/28/09 |
| SY (Turnkey) moved to Yahen | 3221 | 6/15/10 |
| XYY | 3737 | 2/25/10 |
| Yahen (Turnkey)(4 entries) | 3828 | 3/13/10 |
| Yahen (Turnkey) | 3828 | 5/24/10 |
| XYY | 3810 | 3/13/10 |
| XYY (Turnkey) | - | 4/10/10 |
| XYY (Turnkey) | 4002 | 4/10/10 |
| SY | 4002 | 4/15/10 |
| SY | 4002 | 5/22/10 |
| SY | 4329 | 6/3/10 |
| SY | 4341 | 6/4/10 |
| SY | 4002 | 4/15/10 |
| SY (2 entries) | 4002 | 4/21/10 |
| SY | 4320 | 6/3/10 |
| SY (4 entries) | 4341 | 6/4/10 |
| SY (3 entries) | 4002 | 4/15/10 |
| SY (2 entries) | 4002 | 5/27/10 |
| YingJia (Turnkey) | N/A | 4/10/10 |
| XYY (Turnkey)(7 entries) | 4001 | 4/10/10 |
| XYY (Turnkey) (6 entries) | 4001 | 5/22/10 |
| XYY (Turnkey)(6 entries) | 4001 | 5/27/10 |
| SY (Turnkey) | Tool moved from AAA | 4/26/10 |
| YanHen (Turnkey) | 4123 | 5/4/10 |
| YanHen (Turnkey) | 4123 | 5/20/10 |
| YanHen | 4327 | 6/3/10 |
| SY (Turnkey) | 4175 | 5/8/10 |
| XYY | 4176 | 5/6/10 |
| SY (2 entries) | 4222 | 5/17/10 |
| SY (2 entries) | 4222 | 5/21/10 |

| Manufacturer | Tool PO # | Tool PO Date |
|---|---|---|
| ChinFai (Turnkey) (2 entries) | 4221 | 5/21/10 |
| Bcolor | N/A | 5/20/10 |
| Bcolor | N/A | 5/26/10 |
| SY (2 entries) | N/A | 5/20/10 |
| SY (2 entries) | N/A | 5/26/10 |
| SY (13 entries) | N/A | 5/16/10 |
| XYY ( 13 entries) | N/A | 5/16/10 |
| Golden Bright (Turnkey)(3 entries) | - | 6/3/10 |
| SY (Turnkey)(2 entries) | - | 6/10/10 |
| SY (Turnkey) | - | 6/3/10 |
| Kashui (Turnkey) | - | 6/15/10 |
| Kashui (Turnkey) | 4422 | 6/17/10 |
| Kashui (Turnkey)(2 entries) | 4422 | 6/15/10 |
| Kashui (Turnkey) | 4422 | 6/3/10 |
| Yuanmong | 4348 | 6/3/10 |
| ChinFai (Turnkey) | 4420 | 6/17/10 |
| Yahen (2 entries) | - | 6/17/10 |
| Bcolor | - | 6/17/10 |
| SY (Turnkey) (2 entries) | 4440 | 6/18/10 |
| Bcolor | 3978 | 4/9/10 |
| Bcolor | 4023 | 4/16/10 |
| ChinFai (Turnkey) | 4203 | 5/13/10 |
| ChinFai (Turnkey) | 4304 | 5/27/10 |
| JLF (Turnkey) | 4345 | 6/3/10 |
| ChinFair (Turnkey) | 4418 | 6/17/10 |
| JLF (Turnkey) | 4229 | 6/17/10 |
| ChinFai (Turnkey) | 4467 | 6/22/10 |
| Changsheng (2 entries) | 4374 | 6/9/10 |
| Changsheng | N/A | 6/9/10 |
| Caiqiao (2 entries) | N/A | 6/12/10 |
| Caiqiao | 3796 | 3/9/10 |
| Caiqiao | 3796 | 3/19/10 |
| Caiqiao | 3796 | 3/29/10 |
| Caiqiao | 4415 | 6/12/10 |
| Caiqiao | 3956 | 4/8/10 |

16

| Manufacturer | Tool PO # | Tool PO Date |
|---|---|---|
| Caiqiao | 3956 | 4/14/10 |
| Caiqiao(2 entries) | 4415 | 6/15/10 |
| Caiqiao | N/A | 3/10/10 |
| Caiqiao(2 entries) | N/A | 6/15/10 |
| XYY | N/A | 6/9/10 |
| ChinFai | N/A | 6/10/10 |
| JLF | N/A | 6/15/10 |

| Manufacturer | Tool PO # | Tool PO Date |
|---|---|---|
| XYY (4 entries) | N/A | 6/19/10 |
| JiangNan | - | 6/30/10 |
| JiangNan | - | 4/10/10 |
| JiangNan | N/A | 6/17/10 |
| JiangNan | N/A | 6/18/10 |
| Fancy (3 entries) | N/A | 6/17/10 |
| Fancy | N/A | 6/22/10 |

77.     Similarly, an October 12, 2009 OtterBox document details that the Chinese manufacturer known as BColor then possessed seventeen different types of tools or molds that were owned by OtterBox and that OtterBox had requested that BColor produce 1000 units per day from each of these tools or molds.

78.     With limited exception, each of the tool purchase orders identified above resulted in the importation to the United States of OtterBox product, yet without exception, OtterBox did not account for the expense of these tools in declaring the product's customs transaction value.

79.     And, these tools were not inexpensive.  A March 10, 2011 OtterBox document titled "Standard Tooling Prices" specifies that the cost of a given tool ranged from $2,500 to $12,000 per mold.

80.     Additional examples of OtterBox's false customs practices and failure to pay correct customs duties on its imported products from January 2006 to the present will be demonstrated through discovery and at trial.

81.     OtterBox's failure to specify, or to cause to be specified, on the customs entry documents the expenses associated with the IEC's work and the manufacturer's cost of designing and manufacturing the product molds, OtterBox's failure to increase, or to cause to be increased, the transaction value, or duty value, by the amounts OtterBox paid the IEC and paid the

manufacturer to design and manufacturer the tools or molds used to produce the imported product, and OtterBox's failure to increase the amount it paid the government for OtterBox's import customs duties was "knowingly" as that term is defined by 31 U.S.C. § 3729(b).

82.     For example, since August of 2009 Ms. Jimenez consistently advised OtterBox's management that it needed to amend its customs transaction or duty value to specify both the IEC expense and the manufacturer's charge for engineering and manufacturing the product's tools or molds and to increase the product's transaction value by these amounts.

83.     As an OtterBox employee who, in the course and scope of her duties, knew that OtterBox was submitting, or causing to be submitted, false customs import documents, Ms. Jimenez's knowledge of OtterBox's false reverse claims is sufficient, in and of itself, for a jury to conclude that OtterBox's submitted or caused to be submitted knowingly false customs documents and payments.

84.     In addition, on or about August 18, 2009, Ms. Jimenez initiated an e-mail with her supervisor, Deb Dahlinger, regarding the need for OtterBox to comply with the United States customs laws; OtterBox refused at that time to amend its practices.

85.     Similarly, in February of 2010 Ms. Jimenez told the OtterBox Controller, Jane Everhardt, about the deficiencies in OtterBox's customs reporting and payment.

86.     In March of 2010, Ms. Everhardt talked with OtterBox's primary stockholder and CEO, Curtis Richardson ("Richardson") about the issue and Richardson refused to pay the import duties on the tooling or engineering.

87.     Ms. Jimenez believes that this underpayment of OtterBox's federal custom duties was discussed in March of 2010 in OtterBox's Executive Committee which would have included Richardson, the president, Brian Thomas, and the controller, Jane Everhardt.

88.     Ms. Jimenez recalls that Ms. Everhardt told her in this March 2010 timeframe that Richardson specifically refused to cause OtterBox to amend its customs duties practices. Everhardt related to Ms. Jimenez her conversation with Richardson and reported that Richardson said something like: "They'll have to pry that money out of my cold dead hands before I will pay it."

89.     Later, in approximately April of 2010, Bill Lovell was hired as OtterBox's director of purchasing; Mr. Lovell reported to company president Brian Thomas.

90.     Brian Thomas reported directly to Richardson.

91.     After Ms. Jimenez was relocated to China in June of 2010, she told Mr. Lovell in approximately July of 2010 that she would comply with the U.S. customs laws on paying duty on the IEC engineering and the manufacturer's tooling and she detailed her plan to bring OtterBox into compliance.

92.     Before Ms. Jimenez was able to cure OtterBox's knowingly false practices, she was terminated on August 2, 2010.

93.     In addition to Ms. Jimenez's actual knowledge and the events specified in paragraphs 84-92, at all times material hereto, OtterBox acted with deliberate ignorance and reckless disregard regarding the accuracy of its customs import documentation and the amounts it paid to the government in customs duties by, *inter alia*, ignoring the applicable federal customs statutes, rules and regulations, maintaining individuals with little or no experience or knowledge

regarding customs statutes, rules and regulations in positions of authority regarding OtterBox's

customs practices and compliance and failing to exercise due diligence regarding OtterBox's

customs reporting and duty payment obligations.

94.     At all times material hereto, OtterBox failed to amend or correct the knowingly

false customs records or statements and customs payments which it previously had submitted or

had caused to be submitted, and Richardson failed to cause such amendments or corrections to be

made.

## V.     FIRST CLAIM FOR RELIEF- FCA LIABILITY

95.     The Relator incorporates by reference the prior allegations of this Complaint, as

though more fully set forth herein.

96.     On or about January 1, 2006 and continuing through at least February of 2011,

OtterBox "knowingly"  made, used, or caused to be made or used a false record or statement

material to an obligation to pay or transmit money or property to the Government, "knowingly"

concealed or  caused to be concealed and/or  "knowingly" and improperly avoided or decreased

an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C.

§ 3729(a)(7), as amended October 27, 1986, and 31 U.S.C. § 3729(a)(1)(G), as amended May

20, 2009.

97.     On or about January 1, 2006 and continuing through at least February of 2011,

OtterBox "knowingly" failed to amend OtterBox's prior customs documents and customs

underpayments to correct OtterBox's prior false statements and underpayments.

98.     OtterBox's acts and omissions were material.

99.      At all times material hereto, OtterBox acted by and through OtterBox's officers, directors, employees and/or agents and are, therefore, vicariously responsible for the actions of said officers, directors, employees and/or agents.

100.      As a direct and proximate result of OtterBox's actions, the United States Government has sustained damage in the form of unpaid import customs, lost interest on those unpaid import customs and consequential damages.

101.      Accordingly, the United States is entitled to judgment against OtterBox for the full amount of the damages it has sustained because of OtterBox's acts and omissions, plus treble damages, penalties and interest.

## VI.  PRAYER FOR RELIEF

WHEREFORE, the Relator, Bonnie M. Jimenez, on behalf of the United States, requests (a) that the United States Government recover from the Defendant Otter Products, LLC d/b/a OtterBox the full amount of its damages; (b) that the damages described in (a) be trebled as provided in 31 U.S.C. § 3729(a); (c) that a civil penalty of no less than $5,500 and no more than $11,000 be assessed against OtterBox for each false claim, record or statement which OtterBox, or caused to be submitted, directly or indirectly to the Government; (d) that the Court award the Relator all amounts as are permitted under 31 U.S.C. § 3730(d), including an appropriate share of any sums recovered and benefits obtained by the United States in this action, now or in the future, along with the Relator's reasonable expenses, attorneys' fees, and costs incurred herein; and (e) that the Court grant any additional appropriate relief with respect to this *qui tam* claim.

**THE RELATOR DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted this Wednesday, August 14, 2013.

THE LAW FIRM OF MICHAEL S. PORTER

By:    /s/ Michael S. Porter
        Michael S. Porter, Esq.
        4465 Kipling Street
        Wheat Ridge, CO  80033
        Telephone:  (303) 940-8370
        Fax:    (303) 421-4309
        E-mail: porterlaw@comcast.net

        M. Gabriel McFarland, Esq.
        Evans & McFarland, LLC
        910 13th St., Suite 200
        Golden, CO  80401
        Telephone:  (303) 279-8300
        Fax:  (303) 277-1620
        E-mail:  gmcfarland@emlawyers.com

**ATTORNEYS FOR THE PLAINTIFF/RELATOR
BONNIE M. JIMENEZ**

Relator's address:
4816 Mount Massive Drive
Brighton, CO 80601